IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PAULA SMITH-JACKSON,

      Plaintiff,

v.

ELAINE CHAO, *In her Official Capacity as Secretary of the United States Department of Transportation,*[1]

      Defendant.

CIVIL ACTION FILE NO.

1:15-cv-1688-WSD-JKL

## ORDER AND FINAL REPORT AND RECOMMENDATION

Plaintiff Paula Smith-Jackson is an employee of the Federal Aviation Administration ("FAA") and has filed the instant employment discrimination suit against the Secretary of the Department of Transportation. The case is presently before the Court on Defendant's motion for summary judgment [Doc. 55], Plaintiff's motion to strike Defendant's reply brief in support of summary judgment and response to Smith-Jackson's statement of material facts [Doc. 69], and Plaintiff's motion to strike Defendant's "notice of filing" correcting its reply

---

[1] The Clerk is **DIRECTED** to substitute Elaine Chao as the current named Defendant. *See* Fed. R. Civ. P. 25(d).

brief [Doc. 74].  For the reasons discussed herein, Plaintiff's motions to strike, [Docs. 69, 74], are **DENIED**, and I **RECOMMEND** that Defendant's motion for summary judgment [Doc. 55] be **GRANTED IN PART and DENIED IN PART**.  Specifically, I recommend that summary judgment be granted as to Plaintiff's Age Discrimination in Employment Act ("ADEA") claim but denied as to all other claims.

**I.    Smith-Jackson's motions to strike are procedurally improper.**

Because they have the potential to affect the evidence before the Court, I will address Smith-Jackson's motion to strike at the outset.  For various reasons discussed below, Smith-Jackson has moved to strike two of Defendant's filings.  Specifically, she asks that the Court strike portions of Defendant's reply brief [Doc. 67] and Defendant's "notice of filing" [Doc. 72].  Smith-Jackson also indicated to the Court that she wished to challenge Defendant's later "notice of filing" [Doc. 82], and I informed the parties that I would consider the arguments made in opposition to Docket Entry 72 applicable to Docket Entry 82 as well.

Rule 12(f) of the Federal Rules of Civil Procedure, which authorizes motions to strike, states that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous

2

matter."   The rule explicitly provides that the object of a strike must be in a "pleading," which the Rules define as a complaint; an answer; a reply to a counterclaim; an answer to a cross-claim; a third-party complaint; or a third-party answer.  Fed. R. Civ. P. 7(a).  Because Smith-Jackson has not asked this Court to strike anything that would be considered a pleading, her motions [Docs. 69, 74] are **DENIED**.  I will, however, consider the substance of the objections contained in Smith-Jackson's motions.

Smith-Jackson argues that Defendant's citations to the findings of fact of an Administrative Judge who previously ruled on this case are inadmissible. Defendant responds that they are admissible because this Court could accept those findings "in an independent exercise of judgment while engaging in its own de novo review."  [*See* Doc. 71 at 2.]  Even accepting Defendant's position as correct, I would still have to review evidence beyond the EEO Judge's order in order to conduct anything resembling an "independent exercise of judgment." Accordingly, I will not consider any fact to be true based solely on a citation to the EEO Judge's order.  Moreover, given the posture of the case, reliance on such facts is even more inappropriate.  The EEO Judge was likely making factual findings upon a complete review of the record.  Here, at summary judgment, I

3

must make all factual inferences in Smith-Jackson's favor.  Even if, therefore, the EEO Judge made a factual finding that is supported in the record, I cannot accept such facts for purposes of the instant motion unless they are beyond dispute.

Smith-Jackson also asks this Court to disregard Exhibit 20 to Defendant's reply brief, which consists of a chart of alleged comparators.  [*See* Doc. 67-1.]  The exhibit, in its initial form, was unsupported by authentication.  Defendant later, without leave of the court, supplemented the exhibit with a authentication from the AUSA assigned to the case stating that she created the document during the course of litigation and it was intended as a form of demonstrative evidence.  [Doc. 72-2.]  As defense counsel is not a fact witness to the case, I will consider the chart as a demonstrative aid only.  Anything in the chart will be considered factual only if found elsewhere in the record.  Further, again, anything in the chart will be considered a "fact" for summary judgment purposes only if undisputed.

I also agree with Smith-Jackson that many of Defendant's responses to her statements of material fact are problematic.  But, I also find generally problematic the argumentative nature of many of the asserted facts from both parties and conclusory nature of many of the objections from both as well.  For that reason, I will rely on the parties' statements of material facts and responses only to the

4

extent that a party admitted to a straightforward statement of fact from the other party.  *See Lovett v. SJAC Fulton IND I, LLC*, No. 1:14-CV-983-WSD, 2016 WL 4425363, at *2 (N.D. Ga. Aug. 22, 2016) (relying principally on the Court's own review of the record after concluding that the parties' statements of fact "hindered, rather than assisted, the Court in resolving their motions").

Smith-Jackson is also correct that Defendant twice supplemented filings well beyond this Court's deadlines[2] without requesting leave to do so.  [*See* Docs. 72, 82.]  Defendant cites to the local rules for a different court for the proposition that a mere correction to a timely filing may be made at any time, and to the local rules for this court, which do not specifically outline a deadline for such corrections.  [*See* Doc. 76.]  As Defendant acknowledges, the rules of another court do not apply here.   Further, Defendant's late filings were not mere corrections, but substantive additions to exhibits.  For the reasons discussed above, Smith-Jackson's motion to strike is denied as procedurally improper. Nevertheless, her arguments on this point are well taken.  But, as nothing in Defendant's supplemental filings contributes to my below analysis, I do not find

---

[2] The deadlines for filings in this case were extended many times. As a result, I had previously told the parties that the deadline for filing the reply brief that Doc. 72 seeks to amend would not be extended again.  [*See* Dkt. Entry dated Dec. 14, 2016.]

5

it necessary to make any ruling on the admissibility of such evidence, beyond noting the dispute for the District Judge should he find anything in the late filings dispositive.

## II.    Factual Background

Based on the nature of this case and the arguments that the parties have made, I find that it is more efficient to give a brief factual and procedural summary at the beginning, but discuss some of the more claim-specific facts in the course of the analysis only.  This basic factual background consists only of facts upon which the parties agree.

Smith-Jackson began her employment with Defendant in 1982 in Peoria, Illinois.  [Doc. 58 ¶ 2.]  In January 2005, Smith-Jackson moved to Atlanta and began the training at the air traffic control tower in Atlanta ("Atlanta Tower"). [*Id.* ¶ 4.]  Smith-Jackson had previously been fully certified to work as an air traffic control at a level 8 facility, but Atlanta was a level 12 facility, the highest rating of facility.  [*Id.* ¶¶ 3-4.]  In May 2005, Smith-Jackson withdrew from training for the operational air traffic controller position in Atlanta because of an inability to perform the required training.  [*Id.* ¶ 10.]  At that time, Smith-Jackson requested a reassignment to a lower level facility.  [*Id.*]

6

Smith-Jackson has alleged that, on November 8, 2005, she was present when a white male coworker made a racially insensitive comment to a group of visitors.  [Doc. 58 ¶ 28.]  That incident caused Smith-Jackson's psychological injury, and she suffered from anxiety, depression, and post-traumatic stress disorder.  [Doc. 57-1 ¶ 4.][3]  Following that incident, Smith-Jackson began receiving a monthly payment, through the present, from the Office of Workers' Compensation.  [Doc. 58 ¶ 31.]

In June 2006, Smith-Jackson was declared medically disqualified from working as an air traffic controller.  [Doc. 57-1 ¶ 6.]  In September 2006, Defendant proposed to remove Smith-Jackson due to her failure to maintain her medical certification.  [Doc. 58 ¶ 36.]  In October 2006, Smith-Jackson requested a permanent reassignment within the Atlanta "commuting area."  [*Id.* ¶ 38.]  Later in October, Smith-Jackson turned down a job that was offered to her because it required her to drive more than 30 miles, contrary to her doctor's restrictions.  [*Id.* ¶ 41.]  Smith-Jackson offered to accept the same position if it were available within her driving range.  [Doc. 57-1 ¶¶ 13-15.]

---

[3] Defendant did not comply with this Court's direction to copy the individual statements of facts into their responses.  I only cite to the statement of facts, but I will not cite to an objected fact without noting it.

7

In November 2006, Defendant convened a "Reasonable Accommodation Team" meeting to discuss Smith-Jackson. [Doc. 58 ¶ 42.] The parties dispute the actions of Defendant in attempting to accommodate Smith-Jackson, discussed in more detail in the analysis section. But, the parties agree that, from December 2006 through June 2008, Smith-Jackson applied for numerous vacant positions throughout the agency. [Doc. 57-1 ¶ 10.] In July 2007, Defendant notified Smith-Jackson that it was removing her from service effective August 18, 2007 for failing to maintain medical certification. [Doc. 58 ¶ 52.] On August 18, Smith-Jackson was terminated, but retained her workers' compensation payments. [*Id.* ¶ 53.]

In July 2008 (following some amount of internal administrative proceedings), Defendant offered Smith-Jackson a clerical position, but then withdrew the offer. [Doc. 57-1 ¶ 20.] In August 2008, Smith-Jackson was placed in a permanent position as a secretary. [Doc. 58 ¶ 63.] In July 2011, an administrative judge issued a bench decision on an EEO complaint that Smith-Jackson had filed awarding some damages but not finding race, age, gender, or intentional disability discrimination. [*Id.* ¶¶ 64-66.] In September 2011, an EEOC administrative judge increased the amount of damages awarded. [*Id.* ¶¶

8

67-69.]   Defendant paid Smith-Jackson the money awarded by the initial administrative judge, but not the final EEOC decision.  [*Id.* ¶ 73.]

## III.   Procedural History in This Court

The procedural history of this case is long and involves many layers of administrative review.  Where relevant, that history is discussed above and in the analysis.   In this Court, Smith-Jackson filed a complaint and an amended complaint in May 2015.  [Docs. 1, 2.]  The complaint alleged that, in May 1997,[4] she overheard racially derogatory comments in the workplace, which was later determined to have caused a compensable workplace injury.  [Doc. 2 ¶¶ 8-9.]

Smith Jackson alleged that, beginning in October 2006, she sought a reasonable accommodation in the form of a transfer to allow her to continue working after she was found medically disqualified to work as an air traffic controller.   [Doc. 2 ¶¶ 12-14.]  She further alleged that Defendant ignored her requests while they transferred younger, white males when they became medically disqualified.   [*Id.* ¶¶ 16-17.]  She alleged that, after being fired, in August 2007, she sought review from an internal agency panel, who directed Defendant to find her a vacant position.  [*Id.* ¶¶ 21-23.]

---

[4] The parties appear to agree for factual purposes that this incident occurred in November 2005.  [*See* Doc. 58 ¶ 28.]

In light of the above allegations, Smith-Jackson raised claims under Title VII, for race and gender discrimination ("Count I"); the ADEA, for age discrimination ("Count II"); Title VII, for retaliation ("Count III"); and the Rehabilitation Act, for disability discrimination ("Count IV").  [Doc. 2 ¶¶ 44-51.] In litigating the instant summary judgment motion, Smith-Jackson has abandoned her ADEA claim.  [Doc. 57 at 9 n.1.]

## IV.   Discussion

### A.   Smith-Jackson is not barred from bringing suit under the acceptance-of-benefits doctrine, but the money she received from the administrative proceedings below likely must be deducted from any award she receives in this litigation.

Defendant argues that Smith-Jackson's lawsuit is precluded because she accepted the payment that resulted from the administrative judgment below. [Doc. 56-1 at 24.]  Because resolution of this issue may determine whether the merits of Smith-Jackson's case should be heard, I will address it first.

Defendant cites to the "acceptance of benefits" doctrine and argues that Smith-Jackson cannot both accept the fruits of a lower court judgment and still seek review of that judgment in this Court.  [Doc. 56-1 at 24-25.]  Defendant argues that no exception to that rule applies here, because Smith-Jackson accepted payment as ordered by the administrative judge to resolve substantially

10

similar claims and now seeks review of all of the administrative findings.  [*Id.* at 25.]

Smith-Jackson responds that the acceptance of benefits doctrine does not bar a plaintiff from appealing if she accepts money but does not believe that the amount paid sufficiently satisfies all of her claims.  [Doc. 57 at 30.]  She also argues that, while Defendant paid the award of the administrative judge, that award was modified by the EEOC, and Defendant has therefore not paid the final judgment.  [*Id.* at 30-31.]  Smith-Jackson asserts that she is not satisfied with the EEOC's conclusions that Defendant did not intentionally discriminate or retaliate against her, nor that she was awarded the proper amount of compensatory damages.  [*Id.* at 31.]  Further, she argues that Defendant has not satisfied the final agency judgment, because it has not paid the additional compensatory damages per the EEOC's order.  [*Id.*]

Defendant replies that Smith-Jackson's lawsuit here involves a *de novo* review of the case that was before the administrative agency.  [Doc. 67 at 15.] Accordingly, Smith-Jackson cannot accept the payment that resulted from the underlying litigation of those claims while seeking a full review.  [*Id.*]

11

The Eleventh Circuit has explained that it is "well settled that when a litigant accepts the substantial benefits of a judgment, voluntarily and intentionally, and with knowledge of the facts, he waives the right to appeal from an otherwise adverse judgment." *Fidelcor Mortg. Corp. v. Ins. Co. of N. Am.*, 820 F.2d 367, 370 (11th Cir. 1987).  A mere subjective intent to appeal portions of a judgment is insufficient to overcome the general principle.  *Id.*

The Circuit has recently explained that the "acceptance of benefits doctrine" is a kind of equitable estoppel.  *Palmer Ranch Holdings Ltd. v. C.I.R.*, 812 F.3d 982, 994 (11th Cir. 2016).  In *Palmer Ranch*, a review of a Tax Court decision, the court explained that, in some circumstances, even the payment of a judgment does not constitute an acceptance of benefits that would bar an appeal.  *Id.* at 995.  The court gave as an example the situation where a judgment is appealed on the grounds that the damages awarded are inadequate.  *Id.* (citing *United States v. Hougham*, 364 U.S. 310, 312 (1960)).  The court in *Fidelcor*, however, cautioned that the exception does not apply where a party seeks to challenge the resolution of one claim but accepted the benefits of the resolution of a related and non-severable claim.  *See* 820 F.2d at 370.

12

The *Palmer Ranch* court instructed that the parties' objective manifestations of intent should determine whether an appeal can go forward despite a party's acceptance of the payment on a judgment. 812 F.3d at 995. In *Fidelcor*, the objective manifestations were presented in a "standard" satisfaction of judgment form. 820 F.2d at 369. That form included language that the exchange constituted "full payment and satisfaction . . . ordered in and by the judgment . . . and [payee] does hereby authorize, empower and request the Clerk of the said Court to satisfy the said judgment . . . ." *Id.* at 369 n.1.

In another case, the Circuit held that language of satisfaction in a payment can be overridden by other objective manifestations of the party. *See Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 518 F.3d 1302, 1307-08 (11th Cir. 2008). In *Alvarez Perez*, the defendants asked the Circuit Court to vacate its previous opinion in the case on the grounds that the first opinion was issued after the plaintiff had accepted the benefits of the district court judgment, which mooted the appeal. *Id.* at 1304. The court declined to vacate its previous opinion, pointing to the fact that both parties actively litigated the appeal even after the satisfaction of judgment was filed in the district court. *Id.* at 1308. In addition, the defendant had sought stays of two other cases against it, on the grounds that

13

the Circuit Court's ruling could affect those unrelated cases. *Id.* Under those circumstances, the Circuit Court held that, regardless of the language contained in the satisfaction of judgment, the objective intent of the parties was to pursue the appeal even after the payment. *Id.*

There is a further peculiarity about this case that will affect the analysis. Specifically, as Smith-Jackson is a federal employee who brought this suit after a full adjudication before the EEOC, the scope of permissible review in this Court is limited. In *Ellis v. England*, 432 F.3d 1321, 1323-24 (11th Cir. 2005), the Eleventh Circuit discussed the administrative process that federal employees follow when seeking remedy under provisions that full under the EEOC's purview. Upon receiving a favorable decision from the EEOC, a plaintiff who is satisfied with the EEOC judgment may file a suit in district court to force the employer agency to comply. *Ellis*, 432 F.3d at 1324; 29 C.F.R. § 1614.503(g). Alternatively, a federal employee who is dissatisfied with the EEOC's adjudication may file a civil action and obtain the same review available to a private sector plaintiff. *Ellis*, 432 F.3d at 1324; 42 U.S.C. § 2000e-16(c). An employee taking the second option obtains *de novo* review of her claims. *Ellis*,

14

432 F.3d at 1324-25 (citing *Morris v. Rumsfeld*, 420 F.3d 287, 292-94 (3d Cir. 2005)).  There is no third option for review in federal court.

One consequence of the review of the administrative ruling being *de novo* is that this Court may not defer to any part of the administrative adjudication.  *See Ellis*, 432 F.3d at 1325 (holding that a plaintiff could not challenge the damages while leaving administrative liability conclusion intact); *Morris*, 420 F.3d at 292-94 (reaching the same conclusion even where liability and damages were decided in two separate administrative rulings).  As a result, if a plaintiff seeks review of any part of the case, she may not seek review of any less than the entirety of the case.

The parties only cite to one case in which the acceptance of benefits doctrine has been applied by a district court in consideration of an administrative judgment.  *See St. John v. Potter*, 299 F. Supp. 2d 125 (E.D.N.Y. 2004).  In *St. John*, a case with similar facts to this one, the court noted that the plaintiff had neither reserved rights when she received payment following an EEOC determination nor offered to return any money that she "received and deposited" upon filing a suit in federal court.  *Id.* at 129.  The court in *St. John* applied the doctrine because "[t]he defendant has a right to expect that payment rendered in

15

Case 1:15-cv-01688-WSD   Document 83   Filed 07/05/17   Page 16 of 55

full satisfaction of a valid order of an administrative agency will not be ignored or undone." *Id.*

Several other district courts in similar circumstances have held that the plaintiff's acceptance of payment acted as a jurisdictional bar to *de novo* review in the district court. *See Mayfield v. U.S. Dep't of Veterans Affairs*, Civ. A. No. 05-2598, 2007 WL 625827, at *2-3 (E.D. La. Feb. 27, 2007); *Legard v. England*, 240 F. Supp. 2d 538, 546 (E.D. Va. 2002). The Fifth Circuit, however, has rejected such an argument. *Massingill v. Nicholson*, 496 F.3d 382, 386 (5th Cir. 2007).[5] The court in *Massingill* held that, while a plaintiff could not accept some portions of the administrative judgment and seek review of others, nothing in the authorizing statute precluded review where an award had been partially or entirely rendered. *Id.* The court further reasoned that the rationale behind the satisfaction of judgment doctrine—that a party is entitled to repose after paying a judgment—was not a significant factor given that the statute only gives the plaintiff 90 days to file a lawsuit. *Id.* Ultimately, the Fifth Circuit concluded that the suit could go forward, but that the defendant could counterclaim for the

---

[5] *Mayfield*, being a Louisiana case decided roughly six months before *Massingill*, is likely no longer good law. As an unpublished district court case, it could be, of course, no more than persuasive authority.

16

money paid.  *Id.*  The defendant could then "obtain[] offset against any recovery by [plaintiff] and judgment against [plaintiff] if no liability is found or the offset is greater than the recovery."  *Id.* at 386-87.

Given the facts of this case, I find the Fifth Circuit's approach in *Massingill* entirely persuasive.  I agree, and neither party appears to dispute, that the fact that Smith-Jackson received money after the administrative proceeding does not act as a jurisdictional bar to this lawsuit.  *See Massingill*, 496 F.3d at 386.  Looking to the objective manifestations of the parties, *see Palmer Ranch*, 812 F.3d at 995, I also conclude that there is no equitable bar to this suit going forward.

First, it does not appear that Smith-Jackson took any affirmative action in "accepting" the judgment below.  At oral argument on this issue, the parties appeared to agree that the funds from the initial administrative judgment were paid by direct deposit into Smith-Jackson's account.  It is true that Smith-Jackson does not appear to have made any explicit statement reserving her right to challenge the administrative decision (aside, of course, from actually challenging the decision).  But the Eleventh Circuit cases that have discussed a party's failure to make such a statement have done so in cases where a contrary statement was included in an executed document suggesting a full satisfaction of judgment.

17

*See Fidelcor*, 820 F.2d at 369.  Even in the *St. John* case, the court suggested that the plaintiff accepted and cashed a physical check.  *See* 299 F. Supp. 2d at 129 (stating that the plaintiff "received and deposited" the money).  Smith-Jackson, here, has retained the money paid and has not returned it, but has otherwise not taken any action to accept the money paid.

The parties' conduct since Defendant paid the administrative judgment to Smith-Jackson also suggests that the case should be allowed to go forward.[6] Smith-Jackson filed her complaint in May 2015.  [Docs. 1, 2.]  Her complaint sought review on all claims raised in the administrative process, and she did not ask the court to leave any part of the administrative judgment intact without further review.  [*See* Doc. 2.]

Defendant did not make a substantive argument based on the acceptance of benefits doctrine as a defense until moving for summary judgment, more than one year after the complaint was filed.  [*See* Docs. 50, 56.]  In its answer, as a defense, Defendant stated that "Plaintiff has already received relief to which she is

---

[6] I recognize that the payment made here appears to have been for the initial administrative judgment and not after the final EEOC determination, where Smith-Jackson was awarded additional money.  The conclusions that I reach here apply whether or not that distinction makes a difference.  But, my silence on that issue, raised by Smith-Jackson, should not suggest that I have determined that the distinction will always be meaningless.

18

entitled." [Doc. 6 at 7.] That statement does not clearly invoke a sense of expected finality. Without further context, Defendant's answer could be read as merely denying that Smith-Jackson would be entitled to more money on review. Even if the answer did clearly invoke the acceptance of benefits doctrine, after filing its answer, Defendant fully participated in discovery before raising the doctrine in its summary judgment motion. There does not appear to any reason that Defendant could not have raised this issue in a motion to dismiss. I find, therefore, that Defendant manifested an objective intent to proceed with the case in this Court.

The rationale behind the acceptance of benefits doctrine is to protect a defendant who reasonably believed in the finality of its case. The purpose of the doctrine is undermined where a Defendant waits some amount of time and actively participates in litigation before invoking the doctrine. *See Alvarez Perez*, 518 F.3d at 1307-08. I recognize that Defendant's participation here is a far cry from the defendant in *Alvarez Perez*, who, hoping to establish favorable precedent, waited until after receiving an adverse ruling to attempt to invalidate it. Nevertheless, the same reasoning applies here.

My one hesitation in relying solely on the objectively manifested intent of the parties in this case is that the parties have actively litigated a case that is inconsistent with the retention of any benefits. Smith-Jackson's arguments that a plaintiff may retain the benefits of a lower judgment and appeal on the grounds that she is entitled to a larger sum of money are unpersuasive here. The court in *Palmer Ranch* was contemplating a situation where a party was permitted to appeal the amount of damages only. *See* 912 F.3d at 995. Any more expansive reading of the court's language in that case would seem to run afoul of the holding in *Fidelcor* that a party could not accept the benefits of part of a non-severable claim while simultaneously seeking to appeal other parts of that claim. *See* 820 F.2d at 370. Even without the guidance of *Fidelcor*, this conclusion seems correct here. Under *Ellis*, a federal employee, having received a favorable judgment below may: (1) file suit in federal court to enforce that judgment; (2) file suit in federal court seeking a full *de novo* review of all issues; or (3) not file suit in federal court. There is no middle ground. Smith-Jackson is asking this Court for *de novo* review of the case. She, therefore, cannot have the administrative judgment below enforced in any respect. Thus, her retention of the

20

money that was part of the administrative relief is inconsistent with her lawsuit in federal court.

The parties objectively manifested intent to litigate this case in a manner that is impossible under the law, which does present an issue. But, I find that the Fifth Circuit's approach in *Massingill* to be an appropriate resolution. In short, given the circumstances of this case, Smith-Jackson's retention of the money paid during the administrative proceedings will not bar her from continuing, at this point, from obtaining *de novo* review of her claims. The money retained, however, should offset any judgment that Smith-Jackson obtains in this Court. Further, should Smith-Jackson be awarded nothing or less than the amount already received, the difference likely should be returned.[7]

### B. Standard Governing Summary Judgment Motions

A court should grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant carries its burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*

---

[7] The Court in *Massingill* suggested that the agency defendant should file a counterclaim for the money already paid. I express no opinion on the appropriate mechanism for recouping any overpaid funds.

*Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  It is a "fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party." *Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014).  "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions, and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation omitted); *see* Fed. R. Civ. P. 56(c).   "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis*, 432 F.3d at 1326.  Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  In evaluating a summary judgment motion, all justifiable inferences are to be drawn in the nonmovant's favor.  *Id.* at 255.

The movant bears the initial burden of showing that it is entitled to summary judgment.  Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"); *Celotex*, 477 U.S. at 323 ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."); *Clark*, 929 F.2d at 608 (holding that *Celotex* did not change the rule that the movant bore the initial burden, and stating, "[e]ven after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial").

## C.    The *McDonnell Douglas*[8] Burden-Shifting Framework

A plaintiff in an employment discrimination case may prove her case either through direct or circumstantial evidence.  *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-100 (2003) (stating the general principle in discussing jury instructions in mixed-motive Title VII cases).  In *McDonnell Douglas*, the Supreme Court set up a three-step framework for proving employment

---

[8] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

23

discrimination claims using circumstantial evidence. The plaintiff first has to present a prima facie case of discrimination. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). The prima facie case creates a presumption that the plaintiff was subjected to discrimination. *Id.* The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the challenged employment action. *Id.* If the defendant is able to offer such a reason, the presumption of discrimination is rebutted, and the burden of production shifts back to the plaintiff to show that the defendant's justification is just a pretext for discrimination. *Id.*

The basic *McDonnell Douglas* framework applicable in Title VII cases may be applied in Rehabilitation Act cases as well. *See Webb v. Donley*, 347 F. App'x 443, 445 (11th Cir. 2009). Where a plaintiff presents direct evidence of discrimination or retaliation, there is no need to rely on the *McDonnell Douglas* framework. *Wright v. Southland Corp.*, 187 F.3d 1287, 1293 (11th Cir. 1999).

24

D.    **Smith-Jackson's Retaliation Claim**

1.    **Facts Pertinent to the Retaliation Claim**

Kelvin Baker testified that he was an air traffic control specialist for Defendant.  [Doc. 55-5 at 10.]  From 1999 through 2006, Baker was a supervisory air traffic controller.  [*Id.* at 20.]  Baker reported to the operations manager, and, at some point in 2006, Jeffrey Vincent became the operations manager.  [*Id.* at 26.]  The operations manager reported to the air traffic manager, and, later in 2006, Vincent became the acting air traffic manager, where he remained through the end of 2007.  [*Id.* at 27-30, 55-56.]

Baker testified that, when there was a job opening, someone in administration or HR would initially review the applications to determine if applicants met minimum qualifications.  [Doc. 55-5 at 39.]  A hiring decision for a position in the Atlanta air traffic control tower would be made by a team of supervisors with the air traffic manager signing off.  [*Id.* at 41-42.]

Baker testified that, when he was a supervisor in 2006, he recalled working with Smith-Jackson at the Atlanta tower.  [Doc. 55-5 at 62-63.]  He recalled Smith-Jackson being medically decertified and approaching him for advice on

25

being reassigned.   [*Id.* at 63-64.]   Regarding Smith-Jackson's prospects for a

transfer, Baker testified as follows:

> Q.    Do you recall anyone inquiring with the Atlanta Tower about a possible position for Ms. Jackson?
>
> A.    Nobody inquired to me, so, no, I don't have any firsthand knowledge of anybody inquiring.   I wasn't involved in that process.
>
> Q.    Are you aware of anyone talking about inquiries being made about Ms. Jackson?
>
> A.    The only thing that I recall sharing with [Plaintiff] at the time -- and I'm not sure -- this was some point down the road during the process.   At some point she decided to file an EEO complaint.   And I had been given information that there was potentially a job that was set aside for her to be placed in here at the region, but I think because of the EEO complaint, they didn't assign her to the position.
>
> Q.    And how did you become aware of a position that was available?
>
> A.    Well, I'm not sure what position it was.   I just remember that discussion being shared with me.   And so I went back and -- I didn't try to tell [Plaintiff] or ask [Plaintiff] to pull her EEO complaint, but I remember we had a discussion along those lines about it wouldn't -- and this is going back 12 or 13 years now, so I'm trying to get this correct, which I'm supposed to be doing.
>       I just remember that particular discussion being shared with me that a position was potentially available

26

over here at the regional office for her to be placed into at that time, but because of the EEO complaint, it was being withheld until that was resolved, and it was potentially going to be the settlement for the complaint.

[. . .]

Q.    So before [she was fired], that's when this position was available at the regional office?

A.    Before she was terminated, apparently, yes.

Q.    Who told you that it was available, the position was available?

A.    That the position was -- what the position was, I don't know, but it was a conversation I had with Jeffrey Vincent.

Q.    And did he say who was withholding the position?

A.    When he said who was withholding it, I don't know who was withholding it, but I think he had shared with me a conversation that he had with one of the people from civil rights.  What was that lady's name? She's no longer the manager down there.

Q.    In the civil rights division?

A.    Yes, and that's –I can't think of what her name is.

Q.    So Jeffrey Vincent told you that there was a position available for her at the regional office but that it was being held because she filed her EEOC complaint?

27

> A.    That was the way that I believe – that was what
> he shared with me, and I think that's as he understood it,
> but what the position was or what department and all of
> that stuff, I don't know.

[*Id.* at 65-68.]  Baker then testified that he, more or less, told Smith-Jackson that there "was potentially a position available, but because of your EEO complaint pending, it's probably being withheld until that is resolved."  [*Id.* at 69.]

Vincent stated in a declaration that he made no statement to Baker that the FAA had a job for Smith-Jackson but was withholding it because of her EEO complaint.  [Doc. 67-2 at 2.]  He also stated that the FAA did not withhold a position because of an EEO complaint.  [*Id.*]

> **2.    Baker's testimony contains sufficient direct evidence of retaliation connected to an adverse employment action to make summary judgment inappropriate.**

Count III of Smith-Jackson's complaint is a retaliation claim.  [Doc. 2 at 11.]  Defendant argues that Smith-Jackson cannot make out a prima facie case of retaliation because there is insufficient evidence of a causal relationship between her protected activity and an adverse employment action.  [Doc. 56-1 at 18-19.]  Defendant asserts that Smith-Jackson's EEO complaint was filed in January 2006, but she was not fired until August 2007.  [*Id.* at 19.]  Therefore, Defendant argues,

28

there is an insufficient temporal proximity to demonstrate causation.  [*Id.* at 19-20.]  Even if Smith-Jackson could make out a prima facie case, Defendant argues that it had the legitimate reason of firing her based on her medical disqualification, and Smith-Jackson cannot show that reason was pretext for retaliation.  [*Id.* at 20.]

Smith-Jackson responds that Defendant's failure to reassign her, even before her firing, was based on retaliation and is actionable.  [Doc. 57 at 22-23.] She argues that she was treated differently than coworker for whom Defendant searched for vacant positions.  [*Id.* at 24.]  Smith-Jackson cites to testimony from Baker that there was an open position available to her, but that officials of Defendant had said that she would not be given the position because she had filed an EEO complaint.  [*Id.* at 23.]   She argues that there was both direct and circumstantial evidence of retaliation.  [*Id.* at 24.]

In reply, Defendant objects to the use of the Baker testimony as hearsay and speculative.  [Doc. 67 at 6.]  Defendant argues that a close parsing of Baker's language—that there was "potentially" a job and that he "think[s]" the position was denied because of the EEO charge—makes it unclear whether a position actually existed or whether the position was denied because of a protected activity.

29

[*Id.*]  Based on the uncertainty of Baker's testimony, Defendant argues that the testimony cannot credibly be relied on.  [*Id.* at 6-7.]  Further, Vincent testified in a declaration that he never made any statement to Baker and that nobody withheld a job from Smith-Jackson.  [*Id.* at 7.]  Vincent also testified that he searched for a job for Smith-Jackson before human resources took the task over.  [*Id.*]  Defendant then argues that, even assuming that it had withheld two positions in February 2007, it was not sufficiently temporally related to the 2006 EEO complaint.  [*Id.* at 8.]

Direct evidence of discrimination is any evidence that reflects "a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Van Voorhis v. Hillsborough Cty. Bd. of Cty. Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008) (quoting *Wilson*, 376 F.3d at 1086).  Evidence can only be direct if its "intent could be nothing other than" retaliation.  *Id.* (quoting *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989) (discussing an age discrimination case)).  Where a plaintiff shows direct evidence, a defendant must prove that it would have made the same decision absent the retaliatory intent.  *Id.*  Even with direct evidence of discrimination, a plaintiff must present evidence that an adverse employment occurred.  *Id.*

Reading every reasonable inference in Smith-Jackson's favor, Baker's testimony constitutes direct evidence of retaliation connected to an adverse employment action.  Defendant states that the testimony is hearsay, but does not really elaborate on that argument.  Even if not fully argued, I must consider whether evidence is admissible before relying on it.

In relying on Baker's testimony, Smith-Jackson is offering the purported out of court statements of Vincent and, as hearsay within hearsay, an unnamed employee in Defendant's civil rights department for the truth of the matter asserted in those statements.  Specifically, the testimony is being offered to show that the FAA had an available job and declined to offer it to Smith-Jackson because she had filed an EEO complaint.  In that way, the statements meet the basic definition of hearsay.  *See* Fed. R. Evid. 801(c).

The statements, nevertheless, appear to be admissible as non-hearsay under Rule 801(d)(2)(D).  That rule states that a statement is not hearsay if it "is offered against an opposing party" and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed."   Fed. R. Evid. 801(d)(2)(D).  The Eleventh Circuit has held that the statement of the head of research and development of a chemical company regarding a risk of chemical

31

burns associate with one of the company's products was within the scope of his employment. *Wright v. Farouk Sys., Inc.*, 701 F.3d 907, 910-11 (11th Cir. 2012); *see also City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 557-58 (11th Cir. 1998) (statement by employee who set commodity prices for defendant company regarding the company's commodity prices was within the scope of employment).

Here, the purported declarants are Vincent, the head of Smith-Jackson's unit, who signed off on hires, and a member of Defendant's civil rights unit. The statements regarding whether Smith-Jackson's discrimination complaint affected her ability to obtain reassignment within the unit, therefore, seem to be within the scope of those employees' relationship with Defendant. Accordingly, without the benefit of further argument on this point by either party, I find that the testimony is admissible as non-hearsay. *See* Fed. R. Civ. P. 801(d)(2)(D).

The remainder of Defendant's argument that Baker's testimony should not be considered is that it is, on its own terms, speculative, and that it is contradicted by Vincent's testimony. [*See* Doc. 67 at 6-8.] It is correct to say that Baker's deposition on this point is not the most definitive testimony. Most of the doubt evinced by Baker, however, appears to have stemmed from the fact that he was

32

testifying about conversations that happened years prior.  Baker's statement that "I think because of the EEO complaint, they didn't assign [Smith-Jackson] the position," taken alone, would likely not be competent evidence.  *See Pace v. Capobianco*, 283 F.3d 1275, 1278-79 (11th Cir. 2002) (holding that an affidavit that only states that the affiant believes something to be true, without providing a basis for that belief, is insufficient to defeat a summary judgment motion).  But, Baker also unequivocally testified that he had a conversation with Vincent, who relayed to him that the civil rights department was withholding a potentially open position Smith-Jackson had a pending EEO complaint.  [*See* Doc. 65-5 at 65-68.]

The government's arguments that Baker's testimony lacks specific detail, was couched in some amount of doubt, and was contradicted by Vincent's testimony are all compelling reasons why a jury may choose to not credit Baker's testimony.  But, none of Defendant's arguments would allow the Court to simply disregard Baker's testimony at this stage.  The testimony is admissible, and, reading it with every reasonable inference made in Smith-Jackson's favor, it provides direct evidence both that there was an adverse employment action (a failure to reassign or hire) and that the adverse employment action was taken based on a retaliatory animus.  Defendant correctly states that a wide temporal

gap, without more evidence of retaliation, could warrant summary judgment. *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010) (explaining that, if relying on temporal proximity alone to demonstrate causation, the relationship must be "very close").   But, here, Baker's testimony represents further evidence to overcome the temporal gap.   Accordingly, as there is a triable issue of fact as to whether there is direct proof of retaliation, summary judgment on the retaliation claim would be improper.[9]

> **E.   None of the arguments presented by Defendant would make summary judgment on Smith-Jackson's Rehabilitation Act claim appropriate.**
>
> **1.   The Parties' Arguments**

Defendant argues that Smith-Jackson cannot make out a prima facie case of discrimination under the Rehabilitation Act.   [Doc. 56-1 at 20.]   Specifically, Defendant argues that Smith-Jackson is not a "qualified individual" under the act because she was unable to perform the essential functions of her job with or without a reasonable accommodation.   [*Id.* at 21.]   Defendant asserts that Smith-

---

[9] Because I reach this conclusion based on direct evidence of retaliation, the *McDonnell Douglas* analysis does not apply. *See Wright*, 187 F.3d at 1293. If the burden-shifting analysis did apply, I would find that Defendant failed to adequately state a legitimate, non-discriminatory reason for its actions, for the same reasons as stated later in reference to the Title VII claim.

Jackson could not perform her job as an air traffic controller and that Smith-Jackson had not pointed to any reasonable accommodation that would allow her to do so.  [*Id.* at 21-22.]  Defendant appears to argue that only changes to the "essential" functions of the job would allow Smith-Jackson to work in any air traffic controller position, and such changes would not be reasonable.  [*Id.* at 23.]  Further, Defendant argues, apparently as a matter of law, that a transfer to a different setting is not a reasonable accommodation.  [*Id.* at 22-23.]

In response, Smith-Jackson provides a list of positions within the FAA for which she was able to perform the essential functions.  [Doc. 57 at 15-17.]  She argues that her ability to perform those jobs with the accommodation that she not be required to work more than 8 hours a day or drive more than 30 miles to work makes her a qualified individual.  [*Id.* at 16-17.]  She further argues that it does not matter that she was no longer able to perform the job of an air traffic controller, because she was qualified to perform other jobs working for Defendant, and the request for such a transfer constituted a request for a reasonable accommodation.  [*Id.* at 17-19.]  Smith-Jackson argues that Defendant completely failed to respond to her requests for reassignment, constituting a denial of a reasonable accommodation.  [*Id.* at 18-19.]  Smith-Jackson disputes that she was

35

unable to work as a non-operational air traffic controller specialist, distinguishing that from an operational air traffic controller specialist. [*Id.* at 19-21.]

In reply, Defendant argues that Smith-Jackson was not disabled because she was not substantially impaired in the major life activity of working, because she stated that there are a large number of jobs that she is able to perform. [Doc. 67 at 8-9.] Further, Defendant argues that its flight surgeon's decision that Smith-Jackson was medically unable to perform her job as an air traffic controller does not necessarily mean that she was disabled or regarded as disabled under the Americans with Disabilities Act (the "ADA"). [*Id.* at 9.] Defendant maintains that an individual is qualified under the ADA (and thus the Rehabilitation Act) only if she can perform the essential functions of the job that she held with or without accommodation, and not the job to which she was seeking a transfer. [*Id.* at 10-11.] Even if qualified, Defendant argues that Smith-Jackson did not request an accommodation between June 2006 and October 2006. [*Id.* at 11.] When the request was made, the agency offered her an alternate position, but Smith-Jackson was unable to accept, and then failed to provide Defendant with a follow up request for information. [*Id.* at 11-12.] Defendant argues that it continued to search for a reassignment for Smith-Jackson through June 2007. [*Id.* at 12.] As

36

to the Air Traffic Controller Specialist position that Smith-Jackson identified,
Defendant determined that Smith-Jackson lacked the appropriate level of training
for that position.  [*Id.* at 12-13.]

### 2. The Court will not consider any arguments raised for the first time in Defendant's reply brief.

As an initial matter, I must address the fact that Defendant raised at least
two major arguments in its reply brief that were simply not present in its brief
supporting its motion for summary judgment.  In the initial brief, Defendant
argued that it was entitled to summary judgment on the grounds that Smith-
Jackson was not a qualified individual and that reassignment would not be a
reasonable accommodation.  [*See* Doc. 56-1 at 20-24.]  In support of the second
argument, Defendant discusses why a transfer to at least one potential position
would not have been reasonable.  [*See id.* at 23.]  In its reply brief, Defendant
added arguments that Smith-Jackson is not disabled and that it reasonably
accommodated her by searching for a replacement position.  [*See* Doc. 67 at 8-
13.]  Defendant also expands its arguments regarding particular positions to
which a transfer, it contends, would not have been reasonable.

This Court has frequently stated that it need not consider arguments raised
for the first time in a reply brief.  *See, e.g.*, *Marshall v. Dentfirst, P.C.*, 313 F.R.D.

691, 697 n.6 (N.D. Ga. 2016) (Duffey, J.); *Inniss v. Aderhold*, 80 F. Supp. 3d 1335, 1359 n.18 (N.D. Ga. 2015) (Duffey, J.); *Armstead v. Allstate Prop. & Cas. Ins. Co.*, 1:14-cv-586-WSD, 2015 WL 2408049, at *4 n.6 (N.D. Ga. May 20, 2015) (Duffey, J.).   Defendant's expanded arguments regarding some of the specific positions identified in Smith-Jackson's response brief are properly before the court.   But, there is no reason why Defendant could not have raised its arguments that Smith-Jackson was not disabled or that it properly accommodated her in its initial brief.   In fact, Defendant stated that it was "assuming, for the purposes of this motion, that Plaintiff was disabled," [Doc. 56-1 at 21], and it presented no meaningful argument as to why that would not be the case. Accordingly, the arguments raised for the first time in Defendant's reply brief will not be considered.

### 3.     The Prima Facie Case Under the Rehabilitation Act

To establish a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must show that (1) she is disabled, (2) she is otherwise qualified for the position with or without accommodation, and (3) she was subject to unlawful discrimination as the result of her disability.  *Ellis*, 432 F.3d at 1326; *see also Kendall v. Sec'y, Dep't of Veterans Affairs*, __ F. App'x __, 2017 WL

977028, at *4 (11th Cir. Mar. 14, 2017).  The standards for determining liability under the Rehabilitation Act are the same as those under the ADA, and thus cases involving the ADA may be used as precedent in a Rehabilitation Act case.  *Id.* Because, however, the Rehabilitation Act provisions cross-reference the statutory sections of the ADA, *see, e.g.*, 29 U.S.C. §§ 705(9) & 794(d), ADA cases are only applicable insofar as they are consistent with the ADA Amendments Act of 2008 ("ADAAA"), which, among other things, lowered the standard for establishing a disability.  *See* 29 C.F.R. § 1630.2(j)(1)(iv).

> **4.  An issue of fact exists as to whether Smith-Jackson was qualified for the positions to which she sought reassignment.**

Defendant argues that Smith-Jackson's medical disqualification from her incumbent position as an Air Traffic Controller meant that she was not a qualified individual under the Rehabilitation Act.  [Doc. 56-1 at 21.]  Defendant cites to the ADAAA definitions and several cases for the proposition that an individual can only be qualified if she is able to perform the essential functions of her current job.

But, the statute defines a qualified individual as one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds *or desires*."  42 U.S.C. §

39

12111(8) (emphasis added).  Moreover, none of the cases to which Defendant cites in its reply brief for this proposition actually states that a plaintiff seeking reassignment as a reasonable accommodation must be able to perform her current job to qualify for relief under the ADA or the Rehabilitation Act.  In each and every case, the court stated that an individual would be considered qualified if she could identify a reasonable accommodation (including, in some of the cases, a reassignment) that would enable her to perform the essential functions of the job that individual held or desired to hold.  *See Ivey v. First Quality Retail Serv.*, 490 F. App'x 281, 286 (11th Cir. 2012) (plaintiff not qualified because two of plaintiff's requested accommodations would not enable her to perform the essential functions of her job, and it was unreasonable to request a job reassignment that would necessarily have involved a promotion, a move to a currently occupied position, or a redefinition of the essential functions of an existing position); *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1256 (11th Cir. 2007) (involving a request for accommodation in the form of a modified work schedule); *Wood v. Green*, 323 F.3d 1309, 1312-13 (11th Cir. 2003) (plaintiff unqualified because request for indefinite leave of absence as an accommodation was unreasonable).  To the extent that any of those cases used language indicating

40

they were only considering the plaintiff's ability to perform at his or her current position, it was because they were not dealing with a case in which the plaintiff requested reassignment as an accommodation.

Contrary to Defendant's argument, the conclusion that an individual can be qualified based on ability to perform at another position with Defendant is also implicitly supported in *Frazier-White v. Gee*, 818 F.3d 1249 (11th Cir.), *cert. denied*, 137 S. Ct. 592 (2016).  Frazier-White, like Smith-Jackson here, sought reassignment as a possible accommodation for her disability.  *Frazier-White*, 818 F.3d at 1256.  The court readily concluded that Frazier-White was not qualified for her current position without some form of accommodation, but went on to consider whether the plaintiff had identified a reasonable accommodation, including possible reassignment.  *Id.* at 1255.  If Defendant were correct about the meaning of "qualified individual," there would have been no need to discuss the reasonableness of any reassignment.[10]

---

[10] In addition to the implicit discussion in *Frazier-White*, nearly every Circuit Court has long held that an individual who can perform an appropriate reassignment job within the company, even though they cannot perform their existing job, is a "qualified individual" under the ADA.  *See Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1162-63 (10th Cir. 1999) (collecting cases).

Defendant's argument that Smith-Jackson's ability to perform at other positions within the company cannot be relevant is incorrect. The only possible accommodation identified by Smith-Jackson in this case is that she should have been reassigned. The analysis as to whether she was qualified, therefore, turns on whether such a reassignment would have been reasonable. If Smith-Jackson identifies a position to which she thinks a transfer would have been a reasonable accommodation, then of course it matters whether Smith-Jackson could perform that job. Defendant's contention that *only* Smith-Jackson's ability to perform her previous job is relevant would only make sense if a transfer could never be a reasonable accommodation. Defendant does argue that a transfer, as a *per se* rule, is not a reasonable accommodation. But, Defendant is incorrect in that assertion as well.

> **5.** **It is well established that a transfer to a new position can be a reasonable accommodation, Smith-Jackson has identified possible transfers that appear reasonable on their faces, and Defendant has made no argument as to why the specific transfers requested by Smith-Jackson would have been unreasonable.**

The ADAAA makes clear that transfer to another position can constitute a "reasonable accommodation." 42 U.S.C. § 12111(9) ("The term 'reasonable accommodation' may include . . . (B) . . . reassignment to a vacant position.")

42

Defendant does not cite to any precedential authority that would suggest that the Court should ignore the plain reading of that statute. *See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 398-99 (2002) (discussing when a reassignment would be a reasonable accommodation).

Of course, not every requested transfer would be a reasonable accommodation.   Whether a proposed reassignment would be reasonable is heavily dependent on the circumstances. *Frazier-White*, 818 F.3d at 1255.  The burden is on the employee to identify an accommodation and demonstrate that it was reasonable. *Id.*  At the summary judgment stage, an employee meets her burden by showing an accommodation that "seems reasonable on its face." *Barnett*, 535 U.S. at 401-02.   Moreover, an employer's duty to provide a reasonable accommodation is only triggered if the employee made a specific demand for one. *Frazier-White*, at 1255-56.

The court in *Frazier-White* made clear that the analysis into whether a reassignment was reasonable must be made in reference to a specific position. *Id.* at 1256.   The court further suggested that the employee's request for an accommodation must have been for a specific, vacant position. *Id.* at 1257.  If there are multiple possible accommodations that would allow the employee to

43

work, the employer is entitled to choose the offered accommodation.  *See* 29 C.F.R. Pt. 1630, App'x § 1630.9 ("[T]he preference of the individual with a disability should be given primary consideration.  However, the employer provided the accommodation has the ultimate discretion to choose between effective accommodations . . . ."); *see also Beadle v. Hillsborough Cty. Sheriff's Dep't*, 29 F.3d 589, 592 (11th Cir. 1994) ("[T]he inquiry ends when an employer shows that a reasonable accommodation was afforded the employee, regardless of whether that accommodation is one which the employee suggested.").

Here, Smith-Jackson points to evidence that she specifically requested reassignment to several vacant positions with Defendant following her medical disqualification from her air traffic controller position.  [*See* Doc. 57-2 ¶¶ 6-7 (Smith-Jackson's affidavit listing the vacancies to which she applied).]   The fact that Smith-Jackson was able to identify the other positions by vacancy number suggests that the positions were, in fact, vacant.  While, in reply, Defendant argues that Smith-Jackson was unable to perform some of the identified positions, it makes no mention of several of the other positions.[11]  Further, several of the

---

[11] In making this argument, Defendant relies on the declaration of Marilyn Ragland.  The Ragland declaration appears as an exhibit to the initial motion for summary judgment, [Doc. 50-22], but does not appear to be attached to the

identified positions were for a secretary, where Smith-Jackson was eventually placed, suggesting that she was able to perform at least those jobs.  [*See id.*; *see also* Doc. 58 ¶ 63.]  Accordingly, the evidence, as presented in the briefs, shows that Smith-Jackson identified several vacancies during the period between her disqualification and termination, and the parties have not cited to apparent evidence that all of those reassignments would have been unreasonable.[12]  I therefore find that, for purposes of summary judgment, there is at least a triable issue of fact as to whether Smith-Jackson identified an accommodation that seems reasonable on its face, *see Barnett*, 535 U.S. at 401-02, in the form of a reassignment to a vacant position, *see* 42 U.S.C. § 12111(9)(B), that would have allowed her to continue working for Defendant.

Defendant also argues that it did not have a regular policy of reassigning non-disabled employees to lighter duty jobs when they could no longer perform their regular jobs.  [Doc. 46-1 at 23-24.]  Defendant, however, does not make

---

corrected motion for summary judgment, which replaced the initial filing, [*see* Doc. 56].  In any event, even if the Ragland deposition is properly before the Court and would definitively show that Smith-Jackson could not perform *any* of the secretarial positions that she identified, it would not change my conclusion that Smith-Jackson identified at least some vacant positions for which there is no apparent evidence that she would be unqualified.

[12] As discussed above, I reject Defendant's argument that reassignment, generally, is presumptively unreasonable.

clear why that fact would matter, beyond suggesting that the administrative judge below thought it might be important.  [*Id.*]  While adherence to a disability-neutral (such as seniority-based) assignment policy might, in some circumstances, make reassignment of a disabled employee unreasonable, *see Barnett*, 535 U.S. 398-99, Defendant has not come close to making (or, really, attempted to make) such a showing here.

### 6.    Defendant has not successfully demonstrated that it, in fact, accommodated Smith-Jackson.

In its reply brief, Defendant outlines some efforts that it made during the relevant period to locate Smith-Jackson a position.  [Doc. 67 at 11-12.] Defendant does this under the header that Smith-Jackson was not entitled to a reasonable accommodation.  [*Id.*]  As stated above, to the extent that Defendant is arguing that it reasonably accommodated Smith-Jackson, the Court should not consider the argument because it was not raised until the reply brief.  In any event, Smith-Jackson presented evidence that the job that Defendant offered her did not meet a restriction placed on her by her physician.  [*See* Doc. 57-1 ¶ 14.] Defendant has raised, particularly at oral argument, some concerns about the basis of that medical restriction and about Smith-Jackson's cooperation with Defendant in evaluating her medical restrictions.  Those concerns are valid.  But, at the very

46

least, Smith-Jackson's evidence suggesting that the offered job would require going against medical recommendations would raise an issue of fact as to whether Defendant's job offer to her constituted an effective and reasonable accommodation.

### 7.  Summary judgment on the Rehabilitation Act claim should be denied.

In sum, Defendant argues that it is entitled to summary judgment on Smith-Jackson's Rehabilitation Act claim because she was not qualified and her request for a transfer was not reasonable.  [Doc. 56-1 at 24.]  Defendant makes no argument on this claim other than in relation to the prima facie case.  For the reasons discussed above, I reject Defendant's arguments and conclude that it is not entitled to summary judgment on the Rehabilitation Act claim.

### F.  Defendant is also not entitled to summary judgment on Smith-Jackson's Title VII claims.

#### 1.  The Parties' Arguments

Defendant argues that it is entitled to summary judgment on Smith-Jackson's Title VII discrimination claims (based on race and gender) because Smith-Jackson failed to make out a prima facie claim.  [Doc. 56-1 at 10.] Specifically, Defendant argues that Smith-Jackson cannot show that she was

qualified for the position of Air Traffic Controller Specialist. [*Id.* at 11-12.] Defendant also argues that Smith-Jackson could not show that there were any similarly situated employees outside her protected class who were treated more favorably. [*Id.* at 12.] Defendant lists several potential comparators (discussed in more detail below) and argues why none constitutes a valid comparator. [*See id.* at 13-16.] Last, Defendant argues that, even if Smith-Jackson made out a prima facie case, it had a legitimate, nondiscriminatory reason for firing her: Smith-Jackson's medical disqualification. [*Id.* at 17.]

In response, Smith-Jackson argues that there were people who were treated more favorably in that they were reassigned to other positions after being found to be not qualified to be an air traffic controller. [Doc. 57 at 10.] She asserts that testimony in this case has demonstrated that Smith-Jackson's supervisor, Vincent, failed to attempt to locate a suitable position for Smith-Jackson while he had done so for others. [*Id.* at 11-12.] She identifies several individuals who she argues were similarly situated and treated more favorably. [*Id.* at 13-14.]

Defendant's reply on this claim focuses on the specific comparators identified by Smith-Jackson. [Doc. 67 at 2-6.] Those arguments will be addressed in more detail below.

48

A plaintiff can establish a prima facie case of disparate treatment by showing that she was a qualified member of a protected class who was subjected to an adverse employment in contrast with similarly situated employees outside of the protected class. *Wilson*, 376 F.3d at 1087. If a plaintiff can establish a prima facie case, that creates a presumption of discrimination. *Id.* The burden then shifts to the defendant to merely articulate (but not demonstrate) a legitimate, nondiscriminatory reason for its actions. *Id.*

For purposes of analysis I will address this claim in reverse order. Defendant's only statement regarding its potential duty to identify a legitimate and non-discriminatory reason for its employment actions is that it fired Smith-Jackson for failing to maintain her medical certification. [*See* Doc. 56-1 at 17.] Even considering Defendant's exceedingly light burden at this stage, Defendant fails to meet that burden. Smith-Jackson's claim of discrimination is that others who were medically decertified from the Air Traffic Controller position were treated differently.[13] Basing the employment decision solely on Smith-Jackson's

---

[13] Defendant does not raise an argument concerning whether a failure to transfer as an accommodation for a disability can be an adverse employment action for the purposes of establishing a Title VII claim. I, therefore, assume without deciding that, where there is no dispute that an employee could not continue in her current position and a transfer (even a lateral transfer or demotion)

medical decertification, therefore, is non-responsive to the claim.  Accordingly, the outcome of the current summary judgment motion will turn entirely on whether Smith-Jackson has pointed to sufficient evidence to make out a prima facie case.

As to the prima facie case, for reasons similar to those discussed above in relation to the discrimination claim, Defendant's arguments regarding Smith-Jackson's qualifications miss the mark.  Where, as here, a plaintiff acknowledges that she could no longer perform her current job and complains about discrimination in her efforts to find another position with the defendant, it makes little sense to evaluate her qualifications based on the job that she previously held. As an analogy by example, in a failure to promote case, courts look to whether a plaintiff was qualified for the job she sought, not the job she currently held.  *See Springer v. Convergys Customer Mgmt. Grp.*, 509 F.3d 1344, 1347 n.2 (11th Cir. 2007).

The issue of whether there is evidence that Smith-Jackson was treated less favorably than others outside of her classes presents a closer call.  A plaintiff and

---

would allow an employee to continue employment, the denial of such a transfer can be considered an adverse employment action.

a comparator must be similarly situated in "all relevant respects."  *Wilson*, 376 F.3d at 1091 (quotation omitted).

One of the comparators that Smith-Jackson identified was Jonathan Clausen.  [*See* Doc. 57 at 10.]  The parties agree that Clausen was a white male who worked at the Atlanta TRACON.[14]  [Doc. 58 ¶ 16.]  The parties also agree that Clausen was medically disqualified from performing air traffic control duties and was reassigned to another position with Defendant.  [Doc. 57-1 ¶ 26; Doc. 68 ¶ 26.]  Accordingly, there does not appear to be a dispute that Smith-Jackson and Clausen were similarly situated insofar as both were medically disqualified from their positions.

Defendant appears to make four arguments as to why Clausen is not a valid comparator: (1) Clausen worked at TRACON, not the Atlanta tower, when he was injured; (2) Clausen was eventually medically able to be reassigned to his position as an Air Traffic Controller Specialist; (3) Clausen was not treated more favorably than Smith-Jackson, because Defendant actually offered Smith-Jackson a better job than the one they offered Clausen during his period of medical disqualification; and (4) Vincent did not treat Smith-Jackson negatively.

---

[14] The "TRACON" is a different facility from the Atlanta Tower that requires different training but also employs air traffic controllers.

Smith-Jackson does not appear to dispute that either of the first two distinctions exist. Nevertheless, it is not readily apparent what makes the differences between Clausen and Smith-Jackson relevant for purposes of evaluating Smith-Jackson's claim. Defendant does not really explain the relevance of the distinctions either. At oral argument, Defendant explained that Clausen was fully trained to be an air traffic controller at the TRACON facility, while Smith-Jackson was not. There is no suggestion as to why, however, that distinction could be relevant to the decision making here. In other words, Defendant does not argue nor is there any apparent evidence that would suggest that working in the TRACON would make someone more eligible for the clerical positions at issue. The same is true of the fact that Clausen was eventually able to return to his air traffic controller position. Defendant does not suggest a reason why that distinction may have lead to disparate treatment, rather than gender or race.

In support of its argument that Smith-Jackson received a better job offer than Clausen and, therefore, was treated more favorably, Defendant cites to the bench decision at the administrative level below. [Doc. 56-1 at 13; Doc. 56-8 at 25.] The administrative bench decision, however, is not really evidence of

52

anything.  As well reasoned it may have been, this Court is performing a *de novo* review of the evidence, and is certainly not beholden to the administrative judge's judgment concerning the comparative value of two job offers.  Moreover, as explained above, the role of the Court in evaluating a summary judgment motion is to determine whether there is evidence that could support Smith-Jackson's claims, not whether a finding against Smith-Jackson is supportable.

As discussed above in reference to the sufficiency of any accommodation, for summary judgment purposes, there is evidence that could support a conclusion that Defendant only offered Smith-Jackson a position that she was medically unable to perform based on the required amount of travel to the job. No matter what jobs were offered to Smith-Jackson and Clausen, if one employee was physically capable of accepting the job offer, and another was not, the one who could accept was treated more favorably.[15]  Defendant also does not make clear why, even if accepted as true, Vincent's forwarding of Smith-Jackson's job requests would defeat her discrimination claim.

---

[15] It is important to note here, as with the Rehabilitation Act claim, that Defendant is not arguing that it could not have offered Smith-Jackson another apparently vacant position.

In sum, Smith-Jackson pointed to a comparator, Clausen, who was working in a similar role to her, became medically unable to perform that job, and who was reassigned to a different position until he was medically able to work again as an air traffic controller.  Defendant did not point to any difference between the two employees that would demonstrate that they were relevantly dissimilar.  Nor did Defendant point to any evidence that would necessarily defeat an argument that Clausen was treated more favorably than Smith-Jackson.   Accordingly, for purposes of summary judgment, Smith-Jackson can state an adequate prima facie case.  For the reasons stated above, that makes summary judgment inappropriate.

## V.     Conclusion

For the reasons discussed herein, Plaintiff's motions to strike [Docs. 69, 74] are **DENIED**, and it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED IN PART** and **DENIED IN PART**. Specifically, summary judgment should be granted as unopposed as to Smith-Jackson's ADEA claim, but should be denied as to all other claims.

In reaching these recommendations, I think it necessary to emphasize the pertinent standards.  Defendant bears the burden of demonstrating that it is entitled to a judgment as a matter of law by pointing to an absence of dispute of

material fact.  In recommending the denial of summary judgment, I am not concluding or even suggesting that the evidence will ultimately point to Defendant's liability on any claim.  Instead, I am merely concluding that Defendant has failed to meet its burden of demonstrating to the Court that no reasonable view of the evidence would support Smith-Jackson.

IT IS SO ORDERED AND RECOMMENDED this 5th day of July, 2017.

_____
JOHN K. LARKINS III
United States Magistrate Judge

55